## COURT OF APPEALS.

MARTHA ERNST, Executrix, &c., of HENRY ERNST, deceased, respondent agt. THE HUDSON RIVER RAILROAD COMPANY, appellant.

As we have reported this case exclusively, including the first decision of the general term of the supreme court in March, 1860 (19 *How.* 205). the first decision of the court of appeals, September term, 1862 (24 *How.* 97), and the second decision of the court of appeals, March term, 1866 (*ante, p.* 61), we cheerfully publish the dissenting opinion of Judge SUTHERLAND, delivered when the case was first decided in the court of appeals (24 *How.* 97), which last opinion embraces, as we understand, all the opinions delivered in this important case.

In giving us this opinion for publication, Judge SUTHERLAND made the following statement : "The statement of facts preceding the within opinion, was drawn by me with great care, and was deemed to be impartial and accurate, and sufficiently full. If it is thought worth while to report this dissenting opinion, I want the statement of facts preceding it reported." Both are accordingly given below.—REP.

*September Term,* 1862.

THIS is an action under the statute to recover damages of the defendant for negligently causing the death of the plaintiff's testator, Henry Ernst.

The action has been twice tried. On the first trial before Mr. Justice GOULD and a jury, the plaintiff was non-suited, but a new trial was granted, on the ground that the case should have been submitted to the jury.

The second trial was before Mr. Justice HOGEBOOM and a jury, at the Rensselaer circuit, in February, 1861, when a verdict was rendered for the plaintiff for $2,500.

A motion was made for a new trial on the judge's minutes, which was denied. The defendant appealed to the general term from the judgment entered on the verdict, and from the order denying a new trial.

The general term affirmed the judgment and the order denying a new trial, and the appeal to this court is from the judgment of affirmance.

It is admitted by the pleadings, that at the time of the accident which caused the death of Henry Ernst, the defendant managed and operated the Troy and Greenbush Rail-

road, located on the east bank of the Hudson river, extending from Troy to Greenbush ; and it appeared on the trial before Mr. Justice HOGEBOOM, that at or in the village of Bath, the railroad crosses a public road or highway, leading from Sandlake, in the county of Rensselaer, through the village of Bath, to a ferry over the Hudson, called the Bath Ferry.

It further appeared, that on the morning of the 29th day of December, 1855, the decedent left his residence in Sandlake for Albany, with a pair of horses and an empty sleigh, and on arriving at Bath, stopped at Dearstyne's tavern, about one hundred and fifty feet east of the railroad track at the crossing ; that soon afterwards the decedent and one Simmons, who was with him, came out of the tavern, and Simmons proceeded on foot to the ferry to detain the boat for the decedent, who unhitched his horses, and seating himself on a board across the box of the sleigh, which was about ten inches in height, drove directly towards the boat, and that as he approached the railroad crossing, the defendant's train of cars going south, came in collision with the decedent's horses, causing his death.

Several witnesses, who it would appear were competent to judge, testified that the train was going at the time of the collision, from thirty to forty miles an hour. Several of the employees of the defendant estimated the speed at from ten to fifteen miles an hour.

Several witnesses, some eight, who were in a situation to hear, testified that the bell of the engine was not rung or the whistle blown until the moment of collision. The engineer on the train, and one or two other employees of the defendant, testified that the bell was rung and kept ringing, for a distance of eighty rods before reaching the crossing, and that the whistle was blown eighty rods before reaching the crossing.

It also appeared that ordinarily there was a flagman stationed at the crossing ; that at the time of the accident, Miller, the regular flagman, was absent, and a man by the name of Rouse, acted as temporary flagman ; that when

Rouse saw the decedent and the train approaching the cross-ing, he became excited, and made motions for him to stop; that he did not waive any flag, but made the motions with his hands or arms. It appeared that Rouse had no flag.

It further appeared that there was a station house, twelve by sixteen feet in size, located east of the railroad track, and just north of the street leading to the ferry; that in going from the tavern down the street to the railroad track, the view north up the track was obstructed by trees and high ground, so that it could not be seen for a greater distance than thirty rods, until you got within about two rods of the station house; that from that point, as you proceeded on towards the station house, you could see further up the track; at one point for a distance of forty or fifty rods; that the railroad crosses the street nearly on a level; that from the railroad to the ferry, the road for teams was very steep, and that it was one hundred and sixty feet from the railroad to the ferry dock.

It also appeared that the decedent was a teamster, and frequently traveled the road, and knew about the crossing; that it was a very cold day, and he had a shawl about his neck and face; that several persons standing near the track, as they saw the decedent approaching the track hallooed to him to stop, to hold on; that Rouse and Simmons motioned to him to stop.

Hunter, who hallooed to him "hold on, there come the cars," testified, that when he saw the decedent and so hal-looed to him, the cars were ten or twelve rods above the crossing; and it would appear from his testimony that the decedent was then about thirty-five feet from the railroad track, and fifteen or twenty feet from Hunter.

From the testimony of other witnesses, it would appear that the decedent was two or three rods from the track when he was hallooed and motioned to. One witness says he was in the act of driving on the track when Hunter made motions with his hands.

The witnesses did not entirely agree as to the speed with which the decedent approached the railroad. Simmons tes-

tified, that when he heard the cars coming, he looked back and saw the decedent coming, one horse on a jump and the other on a trot. Other witnesses testified that the horses were on a trot; one witness says, on a *moderate trot.* Another witness testified, that when he first saw decedent, he was forty feet from the track, and the horses were on a walk, and walked until struck by the engine. *The hallooing and motions were differently understood by the bystanders ;* one thought they meant keep off, and another, *come on the boat.* Others did not understand the meaning at all.

As the decedent was approaching the track, *some one on the ferry boat made signals and motions for him to come on.*

It appeared that the decedent drank spirituous liquor at three different places before he arrived at Bath, but it did not appear that he was intoxicated. It did not appear that the decedent looked either up or down the track as he approached it, or that he turned his head either way when hallooed to.

At the close of the evidence the defendant moved for a dismissal of the complaint, on the grounds that there was no proof that the death of the plaintiff's testator was caused by any wrongful act, neglect or default of the defendants, and also upon the ground that the case showed that the negligence of the decedent caused, or contributed to cause his own death.

The court denied the motion, and submitted the case to the jury, and to this the defendant excepted.

JOHN H. REYNOLDS, *for the appellant.*
R. A. PARMENTER, *for the respondent.*

SUTHERLAND, J., *dissenting.* It is conceded in the case, that the court correctly stated to the jury the rules of law applicable to questions of negligence. The only question in the case then is, whether the court should have non-suited the plaintiff, or dismissed her complaint at the close of the evidence.

The counsel for the appellant does not ask that the judg-

ment should be reversed on the ground that the question as to negligence on the part of the defendant, or its employees, should not have been submitted to the jury; but on the ground that the decedent was himself plainly negligent, and by his negligence caused, or contributed to cause, his own death.

There is no doubt as to the principle of law, that if the decedent by his own negligence contributed to cause his own death, that the plaintiff cannot recover, however negligent the defendant or its employees may also have been. The question then is, whether it was the province of the court or of the jury in this case, to pass upon the question of negligence on the part of the decedent. In my opinion, it was the province of the jury, and for the grounds of this opinion I refer to my opinion in the case of *Amanda Rhodes, Administratrix, &c.* agt. *The Buffalo and State Line Railroad Company*, decided at the last term of this court. This case never has been reported, but it *seems* that a *portion* of my dissenting opinion in the case was taken and reported as my dis senting opinion in *Wilds* agt. *The Hudson River Railroad Co.* (24 *N. Y. R.* 444, *&c.*), in which case I also dissented.

It may be that the supreme court thought that a verdict for the defendant, would have been more or equally satisfactory, but I do not see upon what principle that court could have granted a new trial. It could not have done so on the ground that the verdict of the jury was against the weight of the evidence as to the carelessness or negligence of the decedent. There was no material conflict in the evidence as to the facts or circumstances relating to the conduct of the decedent, or bearing on the question of carelessness on his part. There may have been a conflict between these facts or circumstances, as arguments on the question of the negligence of the decedent ; that is, that some of these circumstances may have tended to show great carelessness on the part of the decedent, and others of them less carelessness, or usual care and prudence.

It appears to me, if the general term had granted a new trial in this case, it must have been solely on the ground that the

jury had drawn the wrong conclusion from the circumstances of the case relating to the conduct of the decedent; that they had misjudged as to the weight or force of these circumstances, as arguments on the question of the negligence of the decedent.

Now I think it was the peculiar province of the jury to judge of the weight or force of these circumstances relating to the conduct of the decedent. I do not see why the jury were not just as likely to judge rightly as to the conduct of the decedent on the occasion of the accident which caused his death, as the learned judge who presided at the trial; no law having declared what conduct should be deemed careless or prudent on such an occasion.

I think it was the province of the jury first to determine from the evidence how the decedent did conduct; and next, to say whether his conduct was careless or not. No law has defined or declared what shall be deemed careless or negligent conduct in approaching or crossing a railroad; or the facts or circumstances to show negligence in approaching or crossing a railroad; and the misfortune is, as it is not to be supposed that all the facts and circumstances of any two cases will be precisely the same, if this court should reverse this judgment and grant a new trial, its decision can never have the force of authority.

I might refer to the decision of this court in the case of *Betsey Bernhard, Administratrix, &c.* agt. *The Rensselaer and Saratoga Railroad Company*, made a few terms since, to show that the judgment in this case should not be reversed; and the decision of the court in the case of *Amanda Rhodes, Administratrix, &c.* agt. *The Buffalo and State Line Railroad Company*, made at the last term, might with equal propriety be cited to show that the judgment in this case ought to be reversed; but the latter decision did not reverse, and cannot be deemed to have reversed the former decision; for the circumstances of the two cases were entirely different.

But if this court, without regard to the principles and precedents of the common law, which committed questions of conduct to the jury, should in this case assume the prov-

ince of a jury, and undertake to judge from the evidence, whether the conduct of the decedent was careless or not, I do not see how a new trial could be granted.

It is to be presumed that the death of the decedent was caused either by his own negligence or the negligence of the employees of the defendant. It is not to be presumed that he intended to commit suicide, or to wilfully throw away his own life. It is not to be presumed that those in charge of the train intentionally and wilfully run over him. The question is : did the decedent by his own negligence, cause or contribute to the cause of his own death ?

The circumstances, that as he approached the crossing he was hallooed to, and motioned to stop, are relied on to show that he rushed on to his own destruction—but it is easy to see, that all this hallooing, and these motions, might have misled the most prudent man under the circumstances.

What are the circumstances ? The decedent and his companion Simmons, stopped at the tavern in Bath, probably to warm themselves and take a drink, before crossing the river ; they were told that the ferry boat was about starting ; they hurried out of the tavern without drinking ; Simmons hurried down to the ferry on foot to detain the boat ; the decedent unhitched his horses, jumped into his sleigh and hurried on. What was he thinking of ? No doubt of reaching the ferry boat before it left. He sees the motions—he hears the hallooing as well as he could with the shawl about his neck and ears ; he sees Simmons motioning ; *he sees a man on the ferry boat motioning him to come on.* Is it not probable that his mind was so absorbed with the one idea, or fear, that the boat would leave before he could reach it, that he supposed all this hallooing and motioning to mean, " hurry on or the boat will leave you ?" And if he thought so—if any man of ordinary prudence might have thought so under the circumstances—if this was the theory of the conduct of the decedent, which the jury, who saw the witnesses and heard them testify, adopted ; why should this court, with nothing before them but a statement of the evidence, undertake to say that the jury misjudged ?

There was conflicting evidence as to the rate of speed at which the train was running, and also as to whether the engine bell was rung or whistle blown, before the accident.

In looking at the question whether the motion for a non-suit should have been granted, on the ground of the negligence of the decedent, we have a right to assume that the speed of the train was the greatest speed testified to; and that neither the bell was rung nor the whistle blown, before the collision. *Who can say if the bell had been rung or the whistle blown, as required by law, that the decedent would have been misled by the hallooing and motions? or that the accident would have happened if the speed of the train had been such as is prudent at railroad crossings in a village?*

In my opinion, the judgment should be affirmed, with costs.